SOMMEtRVILLE, J:
This is a possessory action brought by plaintiff against five defendants, alleging that they have entered upon a part of lot No. 1 of section 4, township 20 north, range 16 west, situated in the parish of Caddo, state of Louisiana; lots 1 and 2 forming lands surrounded on three sides by the waters of Jeems bayou, a navigable stream, and known as Wilson’s Point. And it has caused a writ of sequestration to issue to protect its rights in the premises; and it asks for judgment in its favor, declaring it to be entitled to the possession of said property, and ousting the defendants therefrom.
Lot No. 1, above referred to, embraces an area of 12.84 acres, as shown by a survey made by Deputy Surveyor Bristol on the map attached hereto. Plaintiff traces its title to Alfred Wilson February 21, 1858, when one of its vendors acquired “all improvements lying on and about the following described land, to wit, the S. E. % of the S. W. % and S. W. % of the S. E. % of section No. 4,” and other land in section 9, township 20, range 16 west.
Part of the land now claimed by plaintiff is in the S. E. % and N. E. % of the S. E. % of section 4. These portions of land do not appear to have been claimed by Alfred Wilson at the time that he sold to Ann Pitts.
Subsequently, February 18, 1892, Thomas 1-1. Pitts obtained a patent from the United States government to a plot of ground containing 123.88 acres, according to the official plat of the survey of said land returned to the General Land Office by the Surveyor General, which included lot No. 1, containing 12.84 acres, above referred to, which land was described in said patent as being “lots numbered 1, 2, 3, and 4 of section 9, and lots numbered 1 and 2 of section 4, in township 20 north, of range 16 west, of Louisana.”
The lot numbered 1, above referred to, is embraced within that portion of the S. W. % of the S. E. % of section 4 on the map which is hereto attached, bounded on the east and north by a red line, and on the west and south by the fractional and sectional lines, and which has been designated as the Bristol survey.
The additional land claimed by plaintiff, say some 40 acres according to plaintiff’s estimate, and 87 acres according to defendants’ estimate, is contained within the brown and green lines on said map, which represent the Williams and Barnes surveys, made respectively for plaintiff and defendants.
On the trial of the case the following stipulation was entered into:
“It is admitted by both parties that J. N. Noel was in possession as owner from the date of his purchase in 1880 to the sale to the plaintiff of the property known as the Wilson’s Point place, his corporeal possession being limited on the east and north by the Bristol meander line, and said Noel never exercised any acts of corporeal possession, or was ever in occupancy of' any land in section 4 east of, or outside of, said meander line, or of any of the land in controversy. This is not intended to apply to any other land west of the land in controversy. That Noel’s possession was vested by act of purchase and continued by occupancy by plaintiff.”
But plaintiff contends that, being the owner and in possession of lot No. 1, bounded by the meander line of Bristol’s survey on the east and north, it is and was in constructive possession of all the property to the east and north of Bristol’s meander line to the water’s edge, and that defendants have trespassed on its property to the extent of 40 acres or 87 acres, as the case may be.
Defendants answered with a general denial, except as to certain admissions made in the answer. They deny that they are in pos *698 session of any part of lot 1, section 4, the property of plaintiff; and they allege that they are in sole and legal possession of some 87 acres of land, giving full description of the same, and embraced within the Barnes survey on the map attached, traced with green lines, since April 2, 1910. They further deny that plaintiff or any of its ancestors in title, or any one else, ever had actual or constructive possession of any part of the land located by them.
They ask that plaintiff’s demand be rejected at its cost and that they be recognized as owners of the property in dispute; and that the rights be reserved to them to sue on the writ of sequestration issued herein.
There was judgment in favor of the plaintiff, recognizing its ownership and possession of lot No. 1—
“and that the tongue of land on which defendants and their lessee have drilled an oil well, projecting north and bounded north, east, and west lay Jeems bayou, is a constituent and component part of lot No. 1, the boundary of said lot No. 1 being the water line of Jeems bayou; it being the purpose of this judgment to fix said Jeems bayou as the boundary of said lot without regard to any arbitrary lines of survey.”
And a writ of possession was ordered to issue to carry out the judgment.
Plaintiff construes the judgment of the district court to be that it is the owner and in possession of the land west of the line between O and D on the fractional sectional line between the S. Eand S. W. % of the S. E. 14 of the section referred to, and then along the waters of Jeems bayou around the point, as is shown by the following quotation from its brief:
“All the plaintiff contends for is the land beginning at the point O, running to the point D, and then along the edge of the waters of Jeems bayou around the point, all of which is west of the body of water marked ‘Cotton Shed Arm.’ The land claimed comprises 'between 40 and 45 acres.”
Defendants have appealed; plaintiff has not asked for .any amendment of the judgment.
The possession of the land in controversy contended for by plaintiff is a constructive, and not an actual, possession of that land. It admits that it and its authors in title never were in actual occupancy of said land; but it claims that it is and was in actual occupancy of lot No. 1, as defined on the notes of surveyor Bristol, and that it is and was in constructive possession of the remainder of the land between the established meander line, and Jeems bayou on the east and north of said lot, which is an occupancy of the whole, under the decisions in Sallier v. Bartley, 113 La. 400, 37 South, 6, and Jones v. Goss, 115 La. 926, 40 South. 357.
[1] As this is simply a possessory action, we cannot go into an investigation of the title of plaintiff or of that of defendants. In Mott v. Hopper, 116 La. 629, 40 South. 921, we say, with reference to the plaintiff’s title in a possessory action:
“Whether such title is a legal title as against the United States, or as against the defendant, is another question, not necessary to determine in this suit.”
And in the case of Smith v. Grant Timber & Manufacturing Co., 130 La. 471, 58 South. 153, we say, with reference to defendant’s title:
“What might be the effect of said decision of the land department upon this case if the title were at issue is a matter not now up for consideration, as the suit is distinctly a possessory action, in which the title cannot be considered, but only the question of the possession vel non. * * * Now, if the question of title cannot be gone into, the legal situation is that, for all the purposes of the suit, the defendant company has no title, de non apparentibus et de non ex-istentibus eadem est ratio. In other words, that the defendant company is not owner, and the plaintiff is not demanding anything of the owner, but simply to be restored to possession.” Code of Practice, arts. 4, 6, 53.
[2] Plaintiff claims possession of the land in this suit as owner; and it produces a title from the United States government, showing it to be the owner of lot No. 1, containing 12.84 acres, and it claims the additional 40 or 87 acres, as the case may be, as a part of lot No. 1, lying between the Bristol mean *700 der line and Jeems bayou, treating said meander line as a regular meander line, and not a boundary line. But we cannot so consider it, particularly in view of tbe admission of plaintiff that:
“It is admitted by both parties that tbe land in controversy is high land, and was bigb land at tbe date that Bristol made bis survey in 1871.”
In Livingston v. Heerman, 9 Mart. (O. S.) 656, 721, we say:
“As at the time of the sale from Gravier and wife to Vessier there existed a portion of soil susceptible of private ownership between the levee and the river, that this soil was retained by the vendor.”
In Barre v. City, 22 La. Ann. 612, we say:
“At the date of the sale to Maria St. Jean there existed in front of the lots she purchased ‘a large batture, which the waters of the river covered only when they reached their highest elevation.’ If this was the case, Maria St. Jean acquired no title to the alluvion formation. The title remained in her vendor.”
And in Hollingsworth v. Chaffe, 33 La. Ann. 547, we say:
“Prom the various decisions of this court on the subject, we deduce the general rule, subject to some exceptions, that, if at the time of the sale of a riparian estate the alluvion or batture attached has attained a sufficient elevation to be susceptible of private ownership, the alluvion does not pass with the land unless so expressed in the act or acts of sale.”
In tbe patent from tbe United States to plaintiff’s authors in title, nothing was said with reference to “the high land, at the date that Bristol made his survey in 1871,” embracing a body of land of 40 to 87 acres.
As plaintiff and its authors held no title to the land referred to it has had neither actual nor constructive possession of the same, and cannot therefore be heard to complain of the acts of these defendants. Its demand for possession must be denied.
[4,5] The meander line established by Bristol on the east and northeast of lot No. 1 does not meet any of the requirements set forth by the Supreme Court of the United States in defining a meander line in Railroad. Co. v. Schurmeier, 7 Wall. 272, 286 (19 L. Ed. 74), which is as follows:
“Meander lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract,, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid, for by the purchaser.
“In preparing the official plat from the field notes, the meander line is represented as the border line of the stream, and shows, to a demonstration, that the water course, and not-the meander line, as actually run on the land, is the boundary.”
The language of this definition shows by the briefest analysis that the meander line is:
(a) “Por the purpose of defining the sinuosities of the banks of the stream;”
(b) “As the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser;” and
.(c) Being outlined and laid down on the plat, “is represented as the border line of the stream, and shows, to a demonstration, that the water course, and not the meander line, as actually run on the land, is the boundary.”
Tested by this definition, which is sustained by all authorities, the so-called meander line of Bristol fails in all respects. Niles v. Cedar Point Club, 175 U. S. 300, 20 Sup. Ct. 124, 44 L. Ed. 171.
A glance at the annexed map, taken from the Williams and Barnes maps in the record (Bristol made no map or plat, and the one made by the draftsman in the Land Office is very small and apparently without reference to a scale), shows that the Bristol meander line does not purport to define the sinuosities of a stream; it is not represented as the border line of a stream; and it shows, to a demonstration, that the meander line, as actually run on the land on the east, and northeast of lot No. 1, is the boundary,, and that a water course is not the boundary.
The eases of Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 838, 35 L. Ed. 428, and Mitchell v. Smale, 140 U. S. 406, 11 Sup. Ct. *702 819, 840, 35 L. Ed. 442, cited by plaintiff, are without application here. There the patents described the land conveyed by reference to the government map, which showed the lots fronting on the lake, and no meander lines were shown. The qirestion there involved was not whether the patent carried the title to the water line, but whether it carried to the middle of the lake. In the case of Hardin v. Jordan, the court said:
“It will be observed that the government survey made in 1834 and 1835, upon which the patent was issued, not only laid down a meander line next to the lake, but also describes said lines as running- ‘along the margin of the lake’; and the plat of the survey returned to the general and local land offices, and refen-ed to in the patent for identification of the land granted, exhibited the granted tract as actually bordering upon the lake.”
And in Mitchell v. Smale, the court held:
“The official plat made from such survey does not show the meander line, but shows the general form of the lake deduced therefrom and the surrounding fractional lots adjoining and bordering on the same. The patents, when issued, referred to this plat for identification of the lot conveyed and are equivalent to and have the legal effect of a declaration that they extend to and are bounded by the lake or stream. Such lake or stream itself, as a natural object or monument, is virtually and truly one of the calls of the description or boundary of the premises conveyed; and all the legal consequences of such a boundary, in the matter of riparian rights and title to land under water, regularly follow.”
It is argued that defendants are mere trespassers, and that they cannot attack plaintiff’s title, under the decisions of this court in Baillio v. Burney, 3 Rob. 317; Bonis v. James, 7 Rob. 149, and Stephenson v. Goff, 10 Rob. 99, 43 Am. Dec. 171. In Baillio v. Burney we found that the plaintiff had a regular chain of deeds, which were valid on their faces, while defendants were mere trespassers, without any title whatever; we held that they could not be heard to pick flaws in plaintiff’s title. In the case at bar plaintiff has no title to the land in question whatever. The case of Bonis v. James presents a similar condition of affairs. Defendants were trespassers; they had no titles; while plaintiff occupied the land under notarial acts of sale. We there held that:
“It cannot be permitted to any one under the pretext of an intention to acquire a title by purchase from the United States to assume that the land he fancies, though in the possession of another, is public, and therefore liable to be entered on at pleasure, and the possessor’s title subjected to investigation at the instance of a trespasser.”
And in Stephenson v. Goff, 10 Rob. 99, 43 Am. Dec. 171, plaintiff had title, while defendant had not. The controversy, as in the present case, was over a strip of land between the tract owned by plaintiff and the river, upon which defendant had settled; and he set up that the land had formed prior to the purchase by plaintiff, and was therefore not included in the act of purchase. We say:
“The main question in the cause is, Was the land, on which Goff has fixed himself, susceptible of ownership or occupation at the time when the lines of the plaintiff were run? If it were and the lines were not extended so as to include all the high land, the plaintiff cannot now claim the batture which has formed adjoining the mainland. The evidence satisfies us that the claim under which the plaintiff alleges possession was located as near to the bar and alluvion forming as it could be. The surveyor is positive in his assertion that the lines were so run. He says that the side line was not marked at all, as he considered the river the boundary. This being the case, we think the plaintiff is entitled to the possession of the batture formed adjoining his land since his survey. * * * We cannot countenance the idea that because a citizen has, or may have, a controversy with the United States, or any other citizen, actually or in prospective, in relation to his rights and title to land, that this authorizes any one to take possession of it, and when sued for so doing, to interpose those difficulties, to protect him from the consequences of an open violation of the rights of both parties.”
[3] We are also cited to tbe case of Whitaker v. McBride, 197 U. S. 510, 25 Sup. Ct 530, 49 L. Ed. 857, in which the plaintiff, Whitaker, was a settler on an island in the main channel of the Platte river, and which had been in the possession of the defendant for more than ten years prior to the suit. Plaintiff had made application to the Land *704 Department of the government to have the island surveyed, and was refused. The defendants held under a patent issued by the United States. The court say:
“The decision of the Supreme Court of the state was that the owner of land bordering on a river owns to the' center of the channel and takes title to any small .bodies of land on his side of the channel that have not been surveyed or sold by the government. It is the settled rule that the question of the title of a riparian owner is one of local law. * * *
“In our judgment the grants of the government bounded on streams and other waters, without any reservation or restriction of terms, are to be construed as to their effect according to the law of the state in which the lands lie.”
The court continues in that opinion, referring to French-Glenn Live Stock Co. v. Springer, 185 U. S. 47, 22 Sup. Ct. 563, 46 L. Ed. 800:
“In the second we held that, as the surveys showed a meander line bordering on a tract of swamp or marsh lands, the grant by patent terminated at the meander line and did not carry the swamp lands lying between it and the shores of Lake Erie. In the third it appeared that there was no body of water in front of the meander line, and we held that that line must therefore be the limit of the grant, and the fact that outside the side lines extended there was a body of water did not operate to extend the grant into any portion of that body of water.”
And the court continued:
“In such a case the rights of riparian proprietors are to be preferred to the claims of the settler.”
The evidence in the record in this case, aside from the admissions of record, show that there was and is a large quantity of swamp or marsh land on the east and north of the Bristol meander line.
[6] But the defendants in this case are not mere trespassers. They have settled on unsurveyed lands belonging to the United States under the provisions of law. Act of February 11, 1897, c. 375, 27 Stat. 347 (U. S. Comp. St. 1901, p. 1434), provides that:
“Any persons authorized to enter lands under the mining laws of the United States may enter and obtain a patent to land containing petroleum and other minerals and chiefly valuable therefor, under the provisions of the laws governing placer mining claims.”
The land in question is placer ground, and these defendants are locators.
Section 910 of the Revised Statutes (U. S. Comp. St. 1901, p. 679) provides:
“No possessory action between persons, in any court of the United States, for the recovery of any mining title, or for damages to any such title, shall be affected by the fact that the paramount title to the land in which such mines lie is in the United States; but each case shall be adjudged by the law of possession.”
And in Mining Co. v. Kerr, 130 U. S. 256, 9 Sup. Ct. 511, 32 L. Ed. 906, where parties had taken possession under the laws of the United States, the court said that “the plaintiff and its grantors had done the work required by law on its mining claim, but had not at the time obtained a patent for either;” and it maintained plaintiff’s right to remove a cloud from its title, or prospective title.
In Dahl v. Raunheim, 132 U. S. 260, 10 Sup. Ct. 74, 33 L. Ed. 324, the court say:
“It does not appear in the present case that a patent of the United States had been issued to the plaintiff; but it appears that he had complied with all the proceedings essential to the issuance of such a patent. He is therefore the equitable owner of the mining ground, and the government holds the premises in trust for him, to be delivered upon the payment specified. We accordingly treat him, in so far as the questions involved in this case are concerned, as though the patent had been delivered to him. Being entitled to it, he has a right to ask a determination of any claim asserted against his possession which may throw doubt upon his title.”
And in Creede & Cripple Creek Mining & Milling Co. v. Uinta Tunnel Mining & Transportation Co., 196 U. S. 337, 25 Sup. Ct. 266, 49 L. Ed. 501, after quoting section 2319, Revised Statutes (U. S. Comp. St. 1901, p. 1424), to the effect that:
“All valuable mineral deposits in the lands belonging to the United States, both surveyed *706 and unsurveyed, are hereby declared to be free and open to exploration and purchase”
—the court proceeded to say:
“A lode locator acquires a vested property right by virtue of his location.”
And then it quoted section 2322, Revised Statutes (U. S. Comp. St. 1901, p. 1425), as follows:
• “The locator * * * shall have the exclusive right of possession and enjoyment of all the surface included within the lines of the location,” etc.
And then it proceeded as follows:
“Until, therefore, by entry and payment to the government, the equitable title to the ground passes to the locator.”
Section 2320 (U. S. Comp. St. 1901, p. 1424) provides
“No location of a mining claim shall be made until the discovery of vein or lode within the limits of the claim is located.”
And the court held that the plaintiff’s title dated hack to the time of discovery of the minerals in the ground upon which the locator had settled. The court proceeded in its opinion to say:
“Discovery in all ages and in all countries has been regarded as conferring rights or claims to reward. Gamboa, who represented the general thought of his age on this subject, was of the opinion that the discoverer of mines was even more worthy of reward than the inventor of a useful art. Hence, in the mining laws of all civilized countries, the great consideration for granting mines to individuals is discovery. ‘Rewards so bestowed,’ said Gamboa, ‘besides being a proper return for the labor and anxiety of the discoverers, have the further effect of stimulating others to ■ search for veins and mines, on which the general prosperity of the state depends.’
“Location is the act or series of acts by which the right.of exclusive possession of mineral veins and the surface of mineral lands is vested in the locator. For ■ this the only requirement made by Congress is the marking of the surface or boundaries of the claim. * * * “A location is not made by taking possession alone, but by working on the ground, recording, and doing whatever, else is required for that purpose by the acts of Congress and the local laws and regulations. * * *
“The order of time in which these several acts are performed is not of the essence of the requirements, and it is immaterial that the discovery was made subsequent to the completion of the acts of location, provided only the necessary acts are done before intervening rights of third parties accrue, etc.
“In 1 Snyder on Mines, § 354, it is said:
“ ‘While the general rule is, as stated elsewhere in the foregoing section, that a location must rest upon a valid discovery, yet a location otherwise good, with the discovery made after location, before the intervention of adverse claims or the creation of adverse rights, will validate the location from the date of discovery and generally from the first act towards claim and appropriation; this by relation.’
“In Morrison’s Mining Rights (11th Ed.) p. 32:
“ ‘If a location be made before discovery, but is followed by a discovery in the discovery shaft, before any adverse rights intervene, such subsequent discovery cures the original defect and the claim is valid.’ ”
It is quite clear from the foregoing references that the defendants in this cause are not mere trespassers. It was admitted on the trial of the cause:
“That defendants on the 2d day of April, 1910, took actual possession of, and posted and filed notices of, location under the placer mining laws of the United States of the tract of land on which they are now in possession, and concerning which this suit is brought, which tract of land is described by metes and bounds in defendants’ answer.
“It is further admitted that, when defendants took possession of said land, they located the western boundary line of their location as the Bristol meander line, as properly located, and the defendants do not claim the ownership or possession of any land west of the true location of said Bristol meander line.
“It is admitted that, since the institution of this suit, the defendants have actually discovered oil and gas, and are now producing oil and gas from-said property.”
Defendants were in possession of the land April 2, 1910, prior to the time of the acquisition by plaintiff in this cause of lot No. 1, which was on April 15, 1910. Defendants do not attempt to disturb plaintiff in its possession of lot No. 1, containing 12.84 acres, which was acquired by patent from the United States government.
In the case of Security Land Co. v. Burns, 193 U. S. 167, 24 Sup. Ct. 425, 48 L. Ed. 662, the Supreme Court say:
“The patentees, it must be also borne in mind, get all the land they really purchased *708 and paid for, as laid down by the lines and distances set forth in the survey and as stated in the patent. These lines and distances gave the patentees the amount they paid for, while if the fourth line of the boundary were taken out and others substituted, so as to reach the borders of the lake, they would get more land than was actually meant or than they supposed they were purchasing, or than they actually paid for.”
We say here that if the eastern and northern boundaries of lot No. 1 were taken out and other boundaries substituted, so as to reach Jeems bayou, plaintiff would get three to seven fold more land than was actually mentioned and described in the patent conveying this lot, or than its ancestor in title supposed he was purchasing, or than he actually paid for.
The judgment appealed from is annulled, avoided, and reversed, and there is judgment in favor of the defendants and against the plaintiff, dissolving the writ of sequestration issued herein, and dismissing this suit at plaintiff's cost; reserving to defendants any rights they may have.
See dissenting opinion of PROVÜSTY, J., 61 South. 760.